**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

COLLEGE PARK TIC 1, LLC, a
Delaware limited liability company et al.,

        Plaintiffs,

vs.

WILLIAM J. CARDEN,

        Defendant.

No. C16-0044-LTS

**MEMORANDUM OPINION AND
ORDER ON CROSS-MOTIONS FOR
SUMMARY JUDGMENT**

## I.  INTRODUCTION

Presently before me are cross-motions for summary judgment.  Plaintiffs College Park TIC 1, LLC, et al. (plaintiffs),[1] were tenant-in-common owners and lessors of a student housing project called College Park Apartments, located in Cedar Rapids, Iowa (College Park or the Property).  Defendant William J. Carden (Carden) is an individual who acted on behalf of a non-existent corporation, American Spectrum Management Co., Inc., a putative Texas corporation (ASM Texas).

---

[1] There are 26 named plaintiffs, starting with College Park TIC 1, LLC, and continuing consecutively through College Park TIC 26, LLC.  A tenancy-in-common (TIC) is a type of ownership that allows two or more people to hold equal, undivided shares in the whole property. *Tenancy in Common*, BLACK'S LAW DICTIONARY (10th ed. 2014).  It can be used as a tool for investors to reap the benefits of owning real estate without participating in the management of the property.  Nat'l Assoc. of Realtors, *Tenants-In-Common: The Parties, the Risks, the Rewards; What Real Estate Licensees Need to Know*, Realtors Commercial Alliance Series, 2005 at 1, https://www.nar.realtor/NCommSrc.nsf/files/RCA%20Hot%20Topics%20Vol.%201%20-20TICs.pdf/$FILE/RCA%20Hot%20Topics%20Vol.%201%20-%20TICs.pdf.

In their complaint (Doc. No. 3), plaintiffs allege that Carden and ASM Texas assumed lessee responsibilities for the Property pursuant to a lease assignment agreement. They further allege that Carden acted as the promoter[2] of ASM Texas and is personally liable for any breaches of the lease. They argue that Carden breached the lease by failing to pay rent and mortgage payments for the Property. Plaintiffs contend that this caused a foreclosure on the Property, resulting in the loss of their interests and investments in the Property.

In their motion for summary judgment (Doc. No. 32), plaintiffs argue that they have proven that the lease assignment was effective, that the lease agreement was breached, and that Carden is personally liable to them for that breach. In his motion for summary judgment (Doc. No. 31), Carden argues that the lease assignment was invalid. Alternatively, he argues that he is not personally liable because the lease had been assumed by a different entity at the time the assignment was made.

The motions are fully submitted and ready for decision. Although both parties have requested oral argument, I find that oral argument is not necessary.

## II.   FACTS

The following facts are undisputed except where noted otherwise:

In 2007, Evergreen Realty Group, LLC (Evergreen), a real estate investment company, sponsored a private placement offering for the sale of tenant-in-common interests in College Park. The College Park student housing complex consisted of 25 buildings, 340 units and 750 beds located on about 21 acres in Cedar Rapids. Doc. No.

---

[2] A promoter of a corporation is one who, before the corporation's organization, directly or indirectly solicits subscriptions to the corporation's stock, assumes to act on the corporation's behalf by purchasing property, or otherwise assists the organization. *Promoter*, Black's Law Dictionary (10th ed. 2014). A promoter may be personally liable on the contracts he or she enters into on behalf of the company. *See King Features Syndicate, Dept. of Hearst Corp. Intern. News Service Division v. Courrier*, 43 N.W.2d 718, 722–23 (Iowa 1950).

3 at 7.  Evergreen then formed College Park Acquisitions, LLC (CP Acquisitions), in order to purchase and sell the tenant-in-common interests.  To carry out the sale, multiple limited liability companies, including the plaintiffs, were formed.[3]

At some point, either on or before November 1, 2007, CP Acquisitions entered into a Master Lease Agreement (Master Lease) with College Park Leasing, LLC (CP Leasing).[4]  CP Acquisitions acted as the landlord/lessor and CP Leasing acted as the tenant/lessee.[5]  Also on November 1, 2007, CP Acquisitions entered into a mortgage loan agreement with Citigroup Global Markets Realty Corp. (Citigroup) to finance the purchase of the Property and, along with CP Leasing, delivered to Citigroup a Multifamily Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing (Citigroup Mortgage).[6]  Plaintiffs then assumed CP Acquisitions' rights and responsibilities and became the landlord/lessors.  CP Leasing remained as the tenant/lessee and had sole authority for the management and operation of the Property.

Under the Master Lease, CP Leasing was obligated to pay its monthly rent in a split fashion.  Basically, it was required to pay the mortgage principal and interest directly to Citigroup out of the base rent and was then required to pay the balance of the base rent

---

[3] Plaintiffs state that "Evergreen and College Park Acquisitions formed *at least* twenty-six (26) limited liability companies to acquire and hold investors' tenants-in-common interests in the Property."  Doc. No. 37-1 at 2 [emphasis added].

[4] Plaintiffs state that the Master Lease was executed on October 27, which Carden admits.  But in his statement of material facts, Carden says the date was November 1.  Plaintiffs then respond that the lease was executed either on or before November 1. Doc. No. 35-1 at 3; Doc. No. 37-1 at 3.  The exact date appears to be irrelevant.

[5] Plaintiffs claim that in 2007 CP Acquisitions entered into a Property Management Agreement with Evergreen Realty Advisors, Inc. (ERA) to manage the Property, which was then assumed by CP Leasing, but Carden denies these facts.  Doc. No. 35-1 at 3.  Plaintiffs cite only to pages 751-53 of their appendix, which is an unauthenticated, undated and unsigned copy of a management agreement. Doc. No. 32-6 at 152–74.

[6] The exact amount and interest rate is disputed (Doc. No. 35-1 at 10).

to plaintiffs. Doc. No. 31-3 at 89. The parties refer to the portion of the rent that was payable to plaintiffs as the "Investor Payments." It appears to be undisputed that between December 1, 2007, and February 28, 2009, CP Leasing made the required rent payments.

On March 16, 2009, Evergreen sent a letter to plaintiffs regarding a 90-day suspension of the Investor Payments that CP Leasing was required to pay under the Master Lease.[7] Evergreen also sought to amend the Master Lease payment requirements, which plaintiffs rejected. On May 26, 2009, Evergreen told plaintiffs that CP Leasing could make only partial distributions of the Investor Payments. On October 15, 2009, Evergreen announced that the Investor Payments would be suspended effective December 1, 2009.[8]

On December 15, 2009, Evergreen entered into a Purchase Agreement with American Spectrum Realty, Inc., a Maryland corporation, and American Spectrum Management Co., LLC, a Delaware limited liability company (together the ASM Parties) for the sale of a number of assets.[9] Carden executed the Purchase Agreement on behalf of the ASM Parties. On January 17, 2010, American Spectrum Realty Management (ASM Realty) took over as property manager. Evergreen and the ASM Parties then began a lengthy process of assigning and transferring all the assets purchased under the Purchase Agreement.

---

[7] It is disputed whether this letter advised plaintiffs of the suspension or simply presented a proposal that the payments be suspended in the future.

[8] It is disputed whether the payments were actually suspended on that date or whether they continued through August 2010. Doc. No. 35-1 at 15. Deposition testimony cited by plaintiffs indicates that the payments were not received. Doc. No. 32-7 at 42; Doc. No. 32-4 at 75. However, bank statements cited by Carden reflect that some deposits were made to College Park TIC 6 through August 2010. Doc. No. 32-15 at 148; 182–99. Whether these deposits were the Investor Payments sought is unclear.

[9] A key dispute is whether the College Park Master Lease was included as one of the assets in the Purchase Agreement.

On November 18, 2011, CP Leasing entered in the College Park Master Lease Assignment (Lease Assignment) with American Spectrum Management Co., Inc., a Texas corporation (ASM Texas). Under the assignment, ASM Texas assumed all of CP Leasing's rights and responsibilities relating to College Park. Carden executed the Master Lease Assignment on behalf of ASM Texas and represented his title as "President."[10] However, ASM Texas is a company that has never existed. The Lease Assignment identifies CP Leasing as assignor and ASM Texas as assignee. It also states that "[t]he American Spectrum Parties have nominated Assignee to accept the assignment of the Evergreen Parties' rights, title, and interest in and to the [College Park Master] Lease." Doc. No. 32-6 at 70. The Lease Assignment identified January 17, 2010, as the effective date of the assignment.

On November 19, 2012, plaintiffs provided the ASM Parties with notice that they were in breach of the Master Lease for failure to pay rents. The notice purported to terminate occupancy and right of possession, but not terminate the Master Lease. In December 2012, the mortgage payment was not made. On January 10, 2013, a foreclosure action was filed and on March 7, 2014, the Property was foreclosed on. The parties agree that plaintiffs have not been paid any of the rent or assessment payments due under the Master Lease since December 2012.[11]

Additional facts will be discussed below, as necessary.

## III. SUMMARY JUDGMENT STANDARDS

Any party may move for summary judgment regarding all or any part of the claims asserted in a case. Fed. R. Civ. P. 56(a). Summary judgment is appropriate when "the

---

[10] Whether Carden acted on behalf of solely ASM Texas, or for ASM Texas as the nominee of ASM Parties, is disputed.

[11] Carden denies plaintiffs' contention that they are owed past due rent payments from January 17, 2010 through December 31, 2016, and disputes the plaintiffs' total calculation of the value of those rents. Doc. No. 35-1 at 25–26.

pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A material fact is one that "'might affect the outcome of the suit under the governing law.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, "the substantive law will identify which facts are material." *Id.* Facts that are "critical" under the substantive law are material, while facts that are "irrelevant or unnecessary" are not. *Id.*

An issue of material fact is genuine if it has a real basis in the record, *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), or when "'a reasonable jury could return a verdict for the nonmoving party' on the question." *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson*, 477 U.S. at 248). Evidence that only provides "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249-50, does not make an issue of material fact genuine.

As such, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 248-49. The party moving for entry of summary judgment bears "the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323). Once the moving party has met this burden, the nonmoving party must go beyond the pleadings and by depositions, affidavits, or otherwise, designate specific facts showing that there is a genuine issue for trial. *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005). The nonmovant must show an alleged issue of fact is genuine and material as it relates to the substantive law. If a party fails to make a sufficient showing of an essential

element of a claim or defense with respect to which that party has the burden of proof, then the opposing party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 322.

In determining if a genuine issue of material fact is present, I must view the evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587-88. Further, I must give the nonmoving party the benefit of all reasonable inferences that can be drawn from the facts. *Id.* However, "because we view the facts in the light most favorable to the nonmoving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004). Instead, "the court's function is to determine whether a dispute about a material fact is genuine." *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996).

On cross motions for summary judgment, the "court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2720 (3d ed. 1998). Because the parties seek summary judgment on some of the same issues, I will consider all the parties' arguments as to each issue, keeping in mind the separate inferences that are to be drawn from each motion. *See Wright v. Keokuk Cnty. Health Ctr.*, 399 F. Supp. 2d 938, 946 (S.D. Iowa 2005).

### IV. ANALYSIS

Both parties agree that the Master Lease is, by its express terms, governed by Iowa law. In order to prevail on a breach of contract claim under Iowa law, the plaintiffs must show: (1) the existence of a contract, (2) the terms and conditions of the contract, (3) the plaintiffs have performed their duties under the contract, (4) the defendant breached the contract and (5) the plaintiff suffered damages as a result of that breach.

*Molo Oil Co. v. River City Ford Truck Sales, Inc.*, 578 N.W.2d 222, 224 (Iowa 1998); *Iowa Arboretum, Inc. v. Iowa 4-H Found.*, 886 N.W.2d 695, 706 (Iowa 2016).

Plaintiffs argue that the lessee's rights and obligations under the Master Lease were effectively assigned to ASM Texas. They contend that they performed their required duties under the contract by providing ASM Parties with notice of default, but that Carden, as promoter of ASM Texas, breached the Master Lease by failing to pay the required rent. Doc. No. 32-1 at 14–16. They argue that Carden caused CP Leasing to assign the Master Lease to ASM Texas and that he is personally liable for breach of contract as President of a non-existent company. *Id.* at 24. Plaintiffs claim they suffered lost rents totaling $15,641,657.26 and lost investments totaling $10,823,270.00, equaling over $25 million in damages. *Id.* at 17.

At the outset, there is a dispute between the parties about whether the Master Lease was subleased to ASM Texas or, instead, assigned. Doc. No. 37 at 8; Doc. No. 40 at 3. An assignment transfers the lessee's entire interest without retaining a reversionary interest. *Duck Creek Tire Serv., Inc. v. Goodyear Corners, L.C.*, 796 N.W.2d 886, 893-94 (Iowa 2011). In a sublease, the lessee reserves a reversionary interest by transferring the interest for a period less than the entire term. *Id.*; *see also* 17 Ia. Prac., Real Estate Law and Practice *General aspects of the landlord-tenant relationship—Assignments and subleases* § 4:3 (2016-2017).

Here, the Lease Assignment "assigns, sells, transfers, sets over and delivers to Assignee 75% of Assignor's estate, right, title and interest in and to the Lease and Assignee hereby accepts such assignment as of the Effective Date." Doc. No. 32-6 at 70. Nothing in the Lease Assignment suggests that CP Leasing, as the assignor, retained a reversionary interest in the portion of the interest that it transferred to ASM Texas. The assignment did not, for example, expressly expire at some point in time prior to the end of the lease term set forth in the Master Lease. Based on the express terms of the Lease Assignment, I find that it was, in fact, a permanent assignment of 75% of CP Leasing's rights and interests in the Master Lease, rather than a mere sublease.

I will next address the elements of a breach of contract claim under Iowa law.

## A.   Existence of a Contract

Plaintiffs argue that a contract exists between them and Carden because (a) the Master Lease was properly executed and created by CP Acquisitions and CP Leasing (Doc. No. 32-1 at 14) and (b) there was a subsequent, valid Lease Assignment between CP Leasing and ASM Texas that made Carden, as promoter of ASM Texas, the principal lessee under the Master Lease contract.  Doc. No. 32-1 at 15.

### 1.   The Consent Requirement for Assigning the Lease

#### a.   Was the Lease Assignment void or merely voidable?

##### i.   The Parties' Arguments

Carden first argues that he is not personally liable because the assignment of the Master Lease was void due to the lack of the lessors' consent.  Doc. No. 35-6 at 3–4. He notes that the language of the Master Lease requires the lessors' consent for any assignment.  *Id.* at 3; Doc. No. 31-1 at 5.  Because plaintiffs, as lessors, did not consent to the assignment of the Master Lease, Carden argues that the assignment was void and, therefore, that no contract exists between he and the plaintiffs.  Doc. No. 35-6 at 10–11. Plaintiffs respond by arguing they merely had the option to object to the assignment and did not do so.  Doc. No. 37 at 2.  As such, they contend that the assignment is valid.

##### ii.   Analysis

The Master Lease addresses assignments as follows:

> Except as herein expressly provided, the prior written consent of the Landlord and its lender under the Permitted Mortgage, which consent may be withheld for any reason or no reason, shall be required in order for Tenant to sell, assign, transfer or otherwise dispose of this Lease or any interest of Tenant in this Lease or in any sublease or in any subrents whether by operation of law or otherwise.

Doc. No. 31-3 at 100. Under Iowa law, restrictions on assignments set forth in lease agreements are enforced when the language is plain and unambiguous. *In re Owen's Estate*, 259 N.W. 474, 476 (Iowa 1935). However, the Iowa Supreme Court has held that such restraints are not favored and should be construed strictly against the lessor because of the limitations they impose on the transfer of property. *Id.* In *Owen's Estate*, the Court held that if an assignment is made by operation of law, rather than through a voluntary transaction, a covenant in the lease against such an assignment is not breached. *Id.* at 476.

Both sides cite *Snyder v. Bernstein Bros.*, 208 N.W. 503 (Iowa 1926), in support of their arguments. Carden relies on *Snyder* to argue that consent restrictions are valid and enforceable, such that any assignment without consent is void. Doc. No. 31-1 at 5. Plaintiffs cite *Snyder* in support of their contention that the lease's assignment restriction simply gives them, as landlords, the option of rejecting or accepting the assignment. Doc. No. 37 at 7. In *Snyder*, defendants were tenants who assigned the lease to another group of tenants. The plaintiff was the landlord who served a notice of forfeiture on the second group of tenants. 208 N.W. at 504. The lease agreement stated that if the lease was assigned without the written consent of the landlord, "the tenancy should at once terminate, and the lessor 'may then, if he so elects, treat and declare this lease void and at an end.'" *Id.* The Court held that the consent requirement was valid and that the original tenants' breach gave the landlord the right to forfeit the lease. *Id.* at 504.

In *Central State Bank v. Herrick*, 240 N.W. 242, 243 (Iowa 1932), the Iowa Supreme Court addressed a situation in which a lease was assigned multiple times before being assigned to the defendant. The defendant failed to pay a portion of the rent during the time he remained on the premises and the lessors took action to recover those rents. *Id.* The Court explained that even though the lessors did not consent in writing to the assignment when it was made, as required by the lease, they "acquiesced therein and by implication consented" to the assignment. *Id.* at 245. The Court went on to state,

[the] [assignee] at this time cannot say that the lease was not properly assigned. Whatever restriction there may have been in the lease against its assignment without the lessors' written consent has been waived by the lessors. Under those circumstances, the lessee is in no position to say that the transfer of the lease to him was invalid.

*Id.*

*Berg v. Ridgway*, 140 N.W.2d 95 (Iowa 1966), also presented a situation in which the lease prohibited the lessee from assigning the lease without the lessors' consent. However, because the landlords accepted rent from the assignee without objection to his occupancy, the Court found that both parties were "acting pursuant to the lease." *Id.* at 97.

Even when a lessor refuses to give consent, he or she can waive the consent requirement by subsequent conduct. *See Colton v. Gorham*, 33 N.W. 76, 77 (Iowa 1887). In *Colton*, the Court found that the lessor knew of the assignment of the lease and the assignee's occupancy of the property for at least two years, accepted rent payments from the assignee, and even made repairs on the property at the assignee's request. *Id.* at 76. The lessor did not demand rent from the original lessees during the time the assignee occupied the property. *Id.* Under these facts, the Court found that the lessor authorized the assignment and accepted the assignee as tenant, discharging the original lessee's duties. *Id.*

As noted above, the Master Lease states, in relevant part, that "[e]xcept as herein expressly provided, the prior written consent of Landlord and its lender under the Permitted Mortgage, which consent may be withheld for any reason or no reason, shall be required in order for Tenant to . . . assign . . . any interest of Tenant." Doc. No. 31-3 at 100. It is undisputed that plaintiffs, as landlords, did not give written consent for the assignment and, indeed, did not receive any documents evidencing the assignment. Doc. No. 37-1 at 31. Nonetheless, Iowa law recognizes that lessors can waive their right to object to an assignment made without their consent. As such, the Lease Assignment

is not void as a matter of law.  Instead, the question is whether plaintiffs did, in fact, waive their lack of consent.

### b.    *Did plaintiffs waive the consent requirement?*
#### i.    *The Parties' Arguments*

In arguing that the plaintiffs affirmatively objected to the assignment, Carden cites a counsel letter and a Verified Petition in Intervention plaintiffs filed in a previous proceeding.  Doc. No. 31-1 at 6–7.  He also cites an email from one investor that states:

> The investors we're [sic] asked to sign an agreement with American Spectrum. I have yet to receive a copy of that agreement. Please be advised that I do not consent to any agreement with American Spectrum until I have received a copy of the agreement so I can make an informed decision.

Doc. No. 31-7 at 10. Carden also cites a letter sent by plaintiffs on November 19, 2012, as evidence of their objection.  Doc. No. 31-6 at 97; Doc. No. 31-7 at 1.

Plaintiffs argue that any objection had to be unanimous to be effective.  Because the objections Carden cites were not unanimous, plaintiffs contend that they are insufficient to demonstrate that the landlords objected to the assignment.  Doc. No. 37 at 7.  Plaintiffs also claim the November 19, 2012, letter was merely a notice of default and demand for payment rather than an objection to the assignment.  Doc. No. 37-1 at 30–31.

Plaintiffs state that since there was no objection, the assignment was merely voidable at their option and they ratified the assignment by accepting rent payments.  Doc. No. 37 at 6.  They cite the expert witness report of Jean Goddard, CPA, as evidence that they did, in fact, accept rent payments.  Doc. No. 32-15 at 6–12.

#### ii.    *Analysis*

In states that, like Iowa, treat covenants against assignment as being waivable by the lessors, such restrictions are deemed to exist for the benefit of the lessors.  *See e.g.,*

*People v. Klopstock*, 24 Cal. 2d 897, 901 (Cal. 1944). Thus, until the lessor takes advantage of the breach, the assignment remains binding on all other parties. *Id.* Generally, if the restriction is only a covenant against assignment, without reference to right of re-entry, the only remedy the lessor has is an action for breach of the covenant against assignment. 1 Tiffany Real Prop. *Assignment of term—Right to assign* § 118 (3d ed. 2017). The fact that an assignment involves a breach of a covenant does not affect the validity of the assignment until the lessor acts. *Id.*

Waiver can occur when the landlord accepts rent payments with knowledge of the assignment, or otherwise deals with the parties as if his or her consent was implied. *See Brayton v. Boomer,* 107 N.W. 1099 (Iowa 1906); *Colton*, 33 N.W. 76. In *Colton*, the Court found that when the lessor refused to initially consent to the assignment at the time the defendants first asked, but later accepted rent payments from the assignee with knowledge of the assignment, that subsequent conduct was enough to waive the condition of consent. 33 N.W. at 76. The lessor made no demand of the defendants, the original lessees, or indicated that he would look to them for future payment. *Id.* In a later case dealing with the termination of a tenancy, the Court addressed *Colton* and concluded that if the lessor knew of the assignment and dealt with parties as if his consent was implied, then that conduct is sufficient to demonstrate waiver. *Brayton*, 107 N.W. at 1100; *see also Seeburger v. Cohen*, 247 N.W. 292, 294 (Iowa 1933).[12]

Carden points to Section 23.2 of the Master Lease Agreement to argue that plaintiffs cannot waive the consent requirement by accepting rents. That section states:

> The acceptance by Landlord of a check or checks drawn by others shall in no way affect Tenant's liability hereunder, nor shall it be deemed an approval of any assignment of this Lease or any sublease of all or a part of the premises not consented to by Landlord or an approval of Tenant not complying with any covenant of this Lease.

---

[12] Here, the Permitted Mortgage also requires consent from the lender in order for an assignment of the lease to be valid. Doc. No. 32-4 at 129. However, the lender's right to consider the lease in default is also exercisable at the lender's option. Doc. No. 31-4 at 48.

Doc. No. 32-6 at 127. As noted above, however, provisions that require the landlord's consent for a valid assignment are for the lessor's benefit. Section 23.2 is similar in that it allows the landlord to collect rents even when he or she objects to an assignment or to a tenant's behavior without waiving that objection. Therefore, whether plaintiffs accepted rent from Carden or ASM Texas is a relevant fact, but is not determinative, on the question of whether plaintiffs waived their right to object to the assignment.

On January 17, 2010, ASM Realty assumed the property management function of the Property. On November 18, 2011, CP Leasing entered into the Lease Assignment with ASM Texas, but the identified effective date was January 17, 2010. It is unclear in what amount rents were paid, if it all, and who was paying them, considering the back-dating of the effective date on the lease. It is clear that some amount of rent payments were received up until August 2010. Doc. No. 41-1 at 9.

In 2012, during the course of a related case pending in the Iowa District Court for Linn County, the ASM parties and plaintiffs were involved in a motion to intervene filed by most of the plaintiffs. In that motion, plaintiffs argued that the Lease Assignment was not valid because they did not consent to it. Doc. No. 31-7 at 166, 179. Carden argues that this is evidence that plaintiffs objected to the assignment. However, in the same proceeding the ASM parties argued that plaintiffs did, in fact, consent by ratifying the assignment through a waiver. Doc. No. 32-7 at 71–72. Thus, under different circumstances, the parties took different positions as to whether the Lease Assignment was valid. Again, this evidence is relevant, but not dispositive, on the issue of whether plaintiffs waived their right to object to the Lease Assignment.

The November 2012 letter, which Carden cites as an objection, states that it is a notice of (1) termination of ASM's management, (2) demand for final accounting, (3) demand for removal of ASM, (4) default of CP Lease Agreement, and (5) transfer of property management functions. Doc. No. 31-6 at 97. The letter includes a statement that plaintiffs:

have neither given their consent to nor acquiesced in the assignment or transfer of the [CP] Property Management Agreement or [CP] Master Lease to any of the ASM parties, and have and continue to vehemently deny the [ASM] Parties' management, operation, and occupation and/or possession of the Premises.

Doc. No. 31-7 at 1.

Once a lessor has waived his or her objection to an assignment that did not comply with a consent requirement, the lessor is estopped from objecting at a later date. *Colton*, 33 N.W. at 76 (holding that when a jury found that the landlord had waived his right to object for lack of consent he was bound to the waiver and could no longer look to the original lessees for rent); *see also West 70th, Inc. v. Koch*, 213 N.W.2d 332 (Minn. 1973) (holding that when the landlord knew of the assignment and accepted rent for 20 months from assignee then served notice on assignee to vacate for not obtaining his consent of the assignment, landlord had waived his right to object). Here, the November 2012 letter seems to be an objection to the Lease Assignment, as it states that the plaintiffs "have neither given their consent to nor acquiesced" to the assignment. Doc. No. 31-7 at 1. However, if plaintiffs had already waived their right to object, by accepting rent payments or through other conduct, then this objection would have no effect.

Based on the current record, it is not clear when plaintiffs actually learned of the Lease Assignment. As noted above, the assignment was entered into on November 18, 2011, but identified an effective date of January 17, 2010. The timing of the November 2012 letter in relation to the timing of assignment is relevant to whether there was a valid objection, which could invalidate the assignment. It is also unclear who was paying rent after the effective date, and whether plaintiffs knew the source of those payments. If plaintiffs knew of the assignment and knowingly accepted rent from the assignees before asserting an objection to the assignment, then they may be estopped from objecting.

Ultimately, when viewing the facts in the light most favorable to plaintiffs for purposes of Carden's motion for summary judgment, I find that a reasonable jury could find for the plaintiffs. Similarly, when viewing the facts in the light most favorable to

Carden for purposes of plaintiffs' motion for summary judgment, I find a reasonable jury could find for Carden. As such, I am unable to grant either motion for summary judgment on this issue of whether the assignment is valid and enforceable.[13]

### 2. The Purchase Agreement's effect on the Assignment
#### a. The Parties' Arguments

Carden argues that, if the assignment was valid, then the Master Lease was included as one of the "Contracts" sold to the ASM Parties in the Purchase Agreement with Evergreen. Doc. No. 31-1 at 13. It was only after the ASM Parties acquired the rights of the Master Lease that it attempted to designate ASM Texas as its nominee[14] in the Master Lease Assignment, which failed because ASM Texas does not exist. *Id.* at 14, 16–18. Therefore, according to Carden, the ASM Parties retained the Master Lease and they, not Carden, are liable under that contract. *Id.*

Carden also contends that he is not a promoter of ASM Texas because he did not take any action to form ASM Texas or solicit contracts for business or shareholders for ASM Texas. Doc. No. 35-6 at 4–5. He argues that the ASM Parties were the only ones

---

[13] Carden also argues that the consent requirement in the Master Lease is a condition precedent to the Lease Assignment, such that without plaintiffs' consent to the assignment, the Lease Agreement did not become effective. Under Iowa law, a condition precedent is a fact or event "occurring subsequent to the making of a valid contract, that must exist or occur before there is a right to immediate performance." *Union Pacific R.R. Co. v. Cedar Rapids and Iowa City Ry. Co.*, 477 F. Supp. 2d 980, 990 (N.D. Iowa 2007). Whether a condition precedent exists is determined by the parties' intention as evidenced by the language of the instrument. *Id.* at 991. Here, the Lease Assignment contains no language indicating that the lessors' consent is a condition precedent to performance under the Lease Assignment. Carden's "condition precedent" argument fails.

[14] A nominee is one who is designated to act for another or who holds bare legal title for the benefit of others. *Nominee*, Black's Law Dictionary (10th ed. 2014). Here, Carden argues that the ASM Parties designated ASM Texas to act for and receive what legally belongs to the ASM Parties, rather than acting on ASM Texas' own behalf.

involved with attempting to create ASM Texas, as a subsidiary. *Id.* at 21. He argues that he acted only as an agent for the ASM Parties, not as a promoter for ASM Texas.

Plaintiffs argue that the Master Lease was not one of the assets included in the Purchase Agreement between Evergreen and the ASM Parties. Doc. No. 37 at 10. They claim that the Master Lease was assigned by CP Leasing to ASM Texas in a separate agreement. *Id.* They further argue that ASM Texas could not be a nominee of the ASM Parties because it did not exist and that Carden acted as a promoter for ASM Texas with regard to the separate agreement. *Id.* at 15. Plaintiffs assert that because ASM Texas did not and does not exist, Carden is personally liable.

### b. Analysis

### i. Purchase Agreement

The parties agree that the Purchase Agreement is governed by California law by virtue of its choice of law clause. Doc. No. 31-5 at 87–88. Under California law, the "mutual intention of the parties at the time the contract is formed governs interpretation" of the contract. *Santisas v. Goodin*, 71 Cal. Rptr. 2d 830, 836 (Cal. 1998). The intent should be inferred from the written provisions, if possible, and the words given their ordinary meanings, unless used in a technical way by the parties. *Id.* However, the contract must also be understood in context of the circumstances it was made and in relation to the matter it addresses. *Mountain Air Enters., LLC v. Sundowner Towers, LLC*, 220 Cal. Rptr. 3d 650, 657 (Cal. 2017). The test is what a reasonable person would believe from the objective manifestations of the parties. *G&W Warren's Inc. v. Dabney*, 218 Cal. Rptr. 3d 75, 84 (Cal. Ct. App. 2017).

California law calls for "liberal use of extrinsic evidence to determine the meaning of a contract" because even though it may appear unambiguous on its face, extrinsic evidence may expose an ambiguity. *Tesoro Ref. & Mktg. Co., LLC v. Pac. Gas and Elec. Co.*, 146 F. Supp. 3d 1170, 1182 (N.D. Cal. 2015). Conflicting extrinsic evidence about the meaning of a contract may require a jury and so be inappropriate for summary

judgment. *Id.* If a contract is ambiguous or uncertain, the parties must have a full opportunity to present evidence on its meaning at trial and summary judgment should not be used. *Lynch v. Spilman*, 431 P.2d 636, 647 (Cal. 1967)(in bank).

> The Purchase Agreement states that Evergreen

> shall sell, transfer, assign, convey and deliver to the [ASM Parties] . . . all of the Evergreen Parties' right, title and interest in and to the following (the "Purchased Assets"): (a) the Contracts (including the Fees payable thereunder), (b) the Intangible Property, (c) the FF&E, (d) the TIC Interests, (e) the Victorville Lease, (f) the Pasadena Lease and (g) the Pasadena Sublease.

Doc. No. 31-5 at 65. The Purchase Agreement defines "Contracts" as "individually, any Management Agreement, Advisory Agreement or Other Contract or, collectively, as the context requires, the Management Agreements, Advisory Agreements and Other Contracts." *Id.* at 58. "Other Contract" is defined as "certain agreements and/or contracts (other than Management Agreements, Advisory Agreements and TIC Agreements) between an Evergreen Party (or any Affiliate thereof) and another Person pursuant to which an Evergreen Party (or an Affiliate) is entitled to receive Fees, some of which are described on Exhibit F attached hereto." *Id.* at 62.

> Sec. 2.2(a) of the Purchase Agreement states:

> [e]ach Evergreen Party (as applicable) shall execute and deliver to [ASM Parties] a Contract Assignment respecting any Contract to which an Evergreen Party is a party conveying the interest of such Evergreen Party in and to such Contract (together with all Fees) to American Spectrum Management Co. One or more of the Contract Assignments assigning the rights of an Evergreen Party under a Management Agreement shall be subject to the subsequent condition that the consent of any required third Person (e.g., lender, holder of a TIC interest, etc.) is obtained.

*Id.* at 65.

The Lease Assignment states that "under the Purchase Agreement, the Evergreen Parties are obligated to assign to the American Spectrum Parties any and all of their rights, title and interest in and to certain leasehold interests, including . . . the Lease

identified on Exhibit A," which identifies the Master Lease Agreement between CP Acquisitions and CP Leasing. Doc. No. 32-6 at 137–39. The Lease Assignment also states that "the American Spectrum Parties have nominated Assignee to accept the assignment of the Evergreen Parties' rights, title and interest in and to the Lease." *Id.* at 137. It identifies CP Leasing as the assignor, rather than Evergreen Parties, and identifies ASM Texas as the assignee. *Id.* at 138.

Plaintiffs cite a series of letters between Carden and the United States Securities and Exchange Commission (SEC) and argues that these letters show that the Purchase Agreement did not include the Master Lease. Doc. No. 37-1 at 192–215. Carden described the assets the ASM Parties acquired as:

- "(i) specific property management and asset management contracts, (ii) non-economic, non-controlling ownership interests in specific real properties that were the subject of those contracts, and (iii) an immaterial amount of personal property . . . ." *Id.* at 195.

- "[C]ertain property management and asset management contracts from [Evergreen], along with any rights to any tenant-in-common interests held by [Evergreen] in the real estate as it relates to those contracts." *Id.*at 202.

- "[I]t did not assume any other liabilities, such as tax obligations, liabilities with respect to deferred salary obligations or any obligations that could arise from any claims by an owner in any of the properties formerly managed by [Evergreen]." *Id.*

- "[O]f virtually all of the properties for which property management agreements were acquired . . . [ASM] also acquired either a tenancy-in-common interest in the property or a controlling interest in an entity that owns a tenancy-in-common interest in the property." *Id.*at 203.

- "(a) management, advisory and other contracts to which Evergreen was entitled to receive fees . . . (b) intangible property . . . (c) office equipment and furnishings, (d) any direct or indirect interests of Evergreen in any property managed by Evergreen and (e) three specified office leases or subleases."[15] *Id.* at 211.

---

[15] The nature of the direct or indirect interests referenced here are described on page 212 of

While helpful, the record is not conclusive for a particular interpretation of the contract. The Lease Assignment is neither expressly included in nor excluded from the scope of the Purchase Agreement. The Lease Assignment indicates the parties intended to include it under the Purchase Agreement. The letters do not mention any leases except the specified ones, but they do state that the ASM Parties acquired interests in properties for which they acquired management contracts.

Further, the nature of the relationship between Evergreen and CP Leasing or CP Acquisitions at the time of the Purchase Agreement is unclear. This uncertainty affects the analysis of which rights Evergreen actually possessed when the Purchase agreement was formed. Only those with ownership rights may designate a nominee to act as their representative. *See Ott v. Home Sav. & Loan Ass'n*, 265 F.2d 643, 647 (9th Cir. 1958). If the Purchase Agreement included the Master Lease, then the ASM Parties obtained ownership rights over that agreement and could have attempted to designate ASM Texas as their nominee, thus precluding Carden from being held liable as a promoter.

Because the intent of the parties is unclear and the Purchase Agreement is ambiguous with respect to the Master Lease, I find that when viewing the facts in the light most favorable to plaintiffs for purposes of Carden's motion for summary judgment, a reasonable jury could find for the plaintiffs. When viewing the facts in the light most favorable to Carden for purposes of plaintiffs' motion for summary judgment, a reasonable jury could find for defendant. Therefore, I am unable to grant either motion for summary judgment on this issue of whether the Master Lease was included in the Purchase Agreement between Evergreen and ASM.

---

Document No. 37-2.

## ii.    *Carden's Promoter Liability*

A promoter is a person who "brings about the incorporation and organization of a corporation," procures subscriptions, and "sets in motion the machinery which leads to the formation itself." *The Telegraph v. Loetscher*, 101 N.W. 773, 774 (Iowa 1904). The word encompasses "a number of business operations, familiar to the commercial world, by which a company is generally brought into existence." *King Features Syndicate, Dept. of Hearst Corp. Intern. News Serv. Div. v. Courrier*, 43 N.W.2d 718, 722 (Iowa 1950). Those acting together to bring about the formation of a corporation are responsible for their actions, and are personally liable on contracts they form, even though they contracted for the benefit of a projected corporation. *Id.*

If the Lease Assignment was not included in the Purchase Agreement and was a separate contract between CP Leasing and ASM Texas, Carden is a promoter of the non-existent company. He signed the lease assignment personally under the title "President." Doc. No. 32-6 at 138. *See Stanley J. How & Assocs., Inc. v. Boss*, 222 F. Supp. 936, 943 (S.D. Iowa 1963) ("the defendant was the principal promoter, acting for himself personally and as President of Boss Hotels, Inc."); *Tin Cup Pass Ltd. P'ship v. Daniels*, 553 N.E.2d 82, 85 (Ill. App. Ct. 1990) (holding parties were promoters when they signed a lease under name of proposed corporation and signed as corporate officers). Carden's argument that he cannot be liable as the agent of ASM Texas because the putative company did not have the capacity to designate him as such is unavailing. A promoter enters into contracts personally and on behalf of a corporation. If the corporation is not formed, the promoter is still personally liable. *King Features Syndicate*, 43 N.W.2d at 722–23.

As noted above, however, any personal promoter liability depends on whether the Master Lease was included as an asset that was obtained by the ASM Parties in the Purchase Agreement. Because that is a disputed issue for trial, so too is the issue of Carden's potential liability as the promoter for ASM Texas.

## B.    Damages

### 1.    Carden's Argument

Carden argues that even if the assignment was valid and he is personally liable, the damages plaintiffs seek are not properly calculated. Doc. No. 35-6 at 26. He argues first that plaintiffs terminated the Master Lease in 2012, either on January 20, 2012 (Doc. No. 35-4 at 122), or on November 19, 2012 (Doc. No. 31-6 at 97), and that doing so eliminated any potential entitlement to future rents. Doc. No. 35-6 at 26. Carden argues that if the plaintiffs are entitled to damages at all, the amount is limited to the unpaid rents in the amount of $1,236,497.17. *Id.*

Carden also argues that, in any event, plaintiffs may not receive damages for any period after January 2013 because they defaulted on the mortgage, thus transferring their right to collect rents to the lender. Doc. No. 35-6 at 29. He argues they are limited to an additional rental amount of $1,839,501.43, which is the amount of rent due from January 2010 through December 2012. *Id.* at 28. Third, he argues that under Section 21.1 of the Master Lease and the foreclosure in March 2014, plaintiffs are only entitled to rent owed up to that date. *Id.* Finally, Carden argues that plaintiffs are not entitled to the amount of their initial investment, as there is no provision in the Master Lease for that kind of recovery. *Id.* at 30.

### 2.    Plaintiffs' Argument

Plaintiffs contend that the January 20, 2012 letter did not terminate the Master Lease because it was not sent on behalf of all the College Park TICs and so was not a unanimous action, which is required by the TIC Agreement. Doc. No. 41 at 3. They further argue that the November 19, 2012, letter did not even purport to terminate the Master Lease. *Id.* Thus, they contend that Carden is liable for all rents from January 2010 through November 2017. *Id.* at 4.

Next, plaintiffs argue that the Lender did not begin collecting rents as of January 2013, thus leaving that right with plaintiffs. *Id.* Indeed, plaintiffs contend that no

payments were made to the Lender after December 2012. *Id.* They cite Section 1.6 of the Master Lease to argue that any default by the Landlord to pay the Lender does not affect Tenant's obligation to pay. *Id*; Doc. No. 32-4 at 115–16.

Plaintiffs also argue that Section 1.6 does not conflict with Section 21.1 and that the foreclosure did not terminate the Lease Assignment. Doc. No. 41 at 4. Finally, they argue that the Master Lease provides for the recovery of their initial investment under Section 18.2(d)(iii), which allows recovery of "any other damages available to Landlord under applicable law." *Id.* at 5; Doc. No. 32-4 at 132. They argue that the loss of their initial investment was a foreseeable loss and was contemplated by the parties when they entered into the agreement. Doc. No. 41 at 5.

### 3.    *Analysis*

Under Iowa contract law, a nonbreaching party must prove that damages resulted from the other party's breach and that the damages were in the contemplation of the parties. *Royal Indem. Co. v. Factory Mut. Ins. Co.*, 786 N.W.2d 839, 847 (Iowa 2010). The nonbreaching party is generally entitled to the damages that will place it in as good a position as it would have occupied had the contract been performed as agreed. *Midland Mut. Life Ins. Co. v. Mercy Clinics, Inc.*, 579 N.W.2d 823, 831 (Iowa 1998) (cited with approval in *Shelby County Cookers, LLC v. Utility Consultants Int'l, Inc.*, 857 N.W.2d 186, 195 (Iowa 2014)). This means that the nonbreaching party is limited to the loss actually suffered. *Id.* The damages must be related to "the nature and purpose of the contract itself, as viewed in connection with the character and extent of the injury." *Id.* Breach of contract damages are meant to be compensatory, not punitive. *Midland Mut. Life Ins. Co.*, 579 N.W.2d at 830.

"The nature and terms of the contract necessarily dictate" what damages are recoverable. *Royal Indem. Co.*, 786 N.W.2d at 847. Whether damages were foreseeable and reasonably anticipated by the parties is dictated by "the language of the contract in the light of the facts, including the nature and purpose of the contract and circumstances

attending its execution." *Id.*; *Kuehl v. Freeman Bros. Agency*, 521 N.W.2d 714, 718 (Iowa 1994). A loss may be foreseeable if it results from the breach in the ordinary course of events or as a result of special circumstances that the breaching party had reason to know. *Royal Indem. Co.*, 786 N.W.2d at 847.

### a. *Termination of Lease*

The parties agree that plaintiffs have not been paid any portion of the guaranteed rent or assessment payments due to them under the Master Lease since December 2012. However, the parties dispute whether plaintiffs terminated the Master Lease in January 2012. The letter dated January 20, 2012, cited by Carden, was sent by David Fogg, an "attorney for College Park TIC," and purported to provide notice of the immediate termination of the lease. Doc. No. 35-4 at 123. The letter was addressed to CP Acquisitions and CP Leasing, and directed to the attention of Luke V. McCarthy. *Id.* at 122. Plaintiffs cite to the deposition testimony of John Campbell (Doc. No 41-2 at 12) and Michael Lynes (Doc. No. 41-2 at 51), who state that the letter was not a unanimous action and did not terminate the Master Lease. Doc. No. 41 at 4. Under the TIC agreement, unanimous approval is required for various decisions, including an election to terminate the Master Lease. Doc. No. 32-7 at 135. As for the November 19, 2012, letter, it expressly stated that "the Landlord is not terminating the Master Lease Agreement pursuant to Paragraph 18.2(i)," but, instead, is terminating "the Leasing Parties' occupancy and possession of the Premises" due to the alleged breaches of the Master Lease. Doc. No. 31-7 at 5.

Whether or not the Master Lease was terminated affects the calculation of damages for breach of contract under Iowa law. *See Ballenger v. Kahl*, 76 N.W.2d 196, 199 (Iowa 1956) (termination of lease relieves a tenant of the obligation to pay future rent); *J.L. Hollen, L.L.C. v. Landergott*, 695 N.W.2d 505, 2005 WL 291572 at *5 (Iowa Ct. App. 2005) (forfeiture of a lease relieved the tenant of liability for all subsequently accruing rents). I agree with plaintiffs that the November 19, 2012, letter, by its express

terms, did not effectuate a termination of the Master Lease. As for the January 20, 2012, letter, the summary judgment record does not allow me to determine, as a matter of law, whether it did or did not accomplish a valid termination of the Master Lease. Therefore, I find a genuine issue of material fact as to whether the Master Lease was terminated.

### b.    Default on Loan

The parties agree that the Multifamily Mortgage gives the Lender the right to collect rents upon the event of default. Doc. No. 41-1 at 53. They also agree that the December 2012 mortgage payment was not paid and that a receiver began managing the Property in January 2013. Doc. No. 35-1 at 24 –25; Doc. No. 41-1 at 53. Finally, they agree that the plaintiffs have not been paid any portion of the guaranteed rent or assessment payments due under the Master Lease since December 2012. Doc. No. 35-1 at 25.

Carden contends that the receiver collected rents in 2013 and paid them to the Lender, and therefore argues that plaintiffs are not entitled to those rents as damages. Doc. No. 35-6 at 29. Plaintiffs angrily argue there is no evidence supporting this contention, declaring it to be "patently false." Doc. No. 41 at 4. However, in their response to Carden's statement of additional material facts, plaintiffs stated: "During 2013, the Receiver collected rents and other income totaling $1,339,065.02, and paid operating expenses and receivership expenses totaling $1,427,391.90, for a net loss of $88,329.88." Doc. No. 41-1 at 54. The income statements similarly show the receiver collected some rent during 2013. Doc. No. 41-2 at 93–94.

As plaintiffs' seemingly contradictory statements suggest, the record is far from clear on the questions of who paid rent after December 31, 2012, how much was paid and how the proceeds were used or applied. Nor does the record conclusively establish if, or when, Carden received notice that rents should be paid to the receiver rather than to the plaintiffs. As a general rule, Carden is correct that if the Lender exercised its contractual rights upon plaintiffs' default, then the Lender had the right to all subsequent

rent payments. *See Union Central Life Ins. Co. of Cincinnati, Ohio v. Goode*, 269 N.W. 762, 764 (Iowa 1936) ("The holder of a mortgage containing a pledge for rents and receivership has a lien on unpaid rents from the commencement of the proceedings, and is entitled to any rents still due and accruing thereafter."); *see also Schoenfelder v. Am. Gen. Life Ins. Co.*, 715 N.W. 2d 767 at *4 (Iowa Ct. App. 2006) ("upon Schoenfelder's subsequent default, under the terms of the mortgage addendum, the lien on all rents received became enforceable"). At this point, however, the summary judgment record is not sufficient to determine the effect of the default as a matter of law.

### c.    *Foreclosure of Property*

Carden argues Section 1.6 and Section 21.1 of the Master Lease are in conflict as to the effect that foreclosure has on the Tenant's liability. Section 21.1 states:

> Tenant agrees that this Lease and all of its rights hereunder and in and to the Premises shall be subject and subordinate at all times to the lien of the Permitted Mortgage and the Declaration. In the event that the holder of the Permitted Mortgage forecloses Landlord's interest in the Premises or accepts a deed in lieu of foreclosure from Landlord as a result of Landlord's default, this Lease and any and all such rights, at such holder's election, shall be terminated.

Doc. No. 32-4 at 135. Section 1.6(iii) states:

> Tenant's obligations under this Lease including, but not limited to, Tenant's obligation to pay the full Base Rent and Assessments, due hereunder, shall not be affected by reason of: (a) any damage to or destruction . . . (b) any taking of the Premises (or any part) by Condemnation or otherwise, (c) any prohibition, limitation, restriction or prevention of Tenant's use, occupancy or enjoyment of the Premises, or any interference with such use, occupancy or enjoyment by any person or entity, public or private, (d) any eviction by paramount title or otherwise, (e) any default by Landlord under this Lease or any other agreement, (f) the impossibility of illegality of any required performance by Landlord, Tenant or both . . . ."

*Id.* at 116.

26

These provisions are not in conflict. Section 1.6(iii) makes it clear that the Tenant's obligation to pay rent continues despite certain catastrophic events, including the Landlord's default. Under Section 21.1, if the mortgage is foreclosed the mortgagee may *elect* to terminate the Master Lease ("at such holder's election"), but termination is not automatic. As noted above, under Iowa law termination would extinguish the obligation to pay future rents. Here, however, it is not apparent from the summary judgment record that the mortgagee exercised its right to terminate the Master Lease. For example, the Consent Decree of Foreclosure and Judgment Entry Order (Doc. No. 32-13 at 8) does not address the status of the Master Lease. Once again, then, I find that the record is insufficient to determine, as a matter of law, the effect that the foreclosure had on the parties' respective rights and obligations.

### d.    *Initial Investments*

Under Iowa contract law, plaintiffs are entitled to recover damages arising from the loss of their initial investments if that loss was reasonably anticipated and foreseeable by the contracting parties. That question requires examination of "the language of the contract in the light of the facts, including the nature and purpose of the contract and circumstances attending its execution." *Royal Indem. Co.*, 786 N.W.2d at 847.

Plaintiffs cite Section 18.2(e)(iii) of the Master Lease, which permits the Landlord to recover "any other damages" under applicable law, and argue that the loss of their initial investments was reasonably foreseeable and contemplated by the parties. Other than referencing Section 18.2(e)(iii), plaintiffs point to no evidence supporting this argument. Doc. No. 41 at 6; Doc. No. 32-4 at 131.

Carden disagrees and, further, argues that initial-investment damages would put plaintiffs in a better position than if the contract had been performed. Because this issue requires a factual analysis that includes the contract language and evidence concerning the circumstances under which the Master Lease was formed, I find that it is not appropriate for summary disposition.

### e.     *Percentage of Damages Owed*

Finally, Carden notes that only 91.77% of the TIC owners are plaintiffs in this case and that only 75% of CP Leasing's interest was transferred in the Lease Assignment. Thus, he suggests (in a footnote) that the amount of any damages should be reduced by those percentages. Doc. No. 35-6 at 30 n.12. With regard to the percentage of CP Leasing's interest that was assigned, plaintiffs contend that Carden assumed 100% of the liability because the Lease Assignment states: "Assignee hereby assumes the performance of all of the terms, covenants and conditions imposed upon Assignor as less [sic] under the Lease accruing or arising on or after the Effective Date." Doc. No. 41 at 4 n. 3; Doc. No. 32-6 at 137.

Generally, an assignment puts the assignee "in the same relationship toward the lessor as was occupied by the lessee, meaning the assignee assumes all the burdens and benefits originally held by the lessee." *Duck Creek Tire Serv., Inc*, 796 N.W.2d at 893. However, the extent of the obligations a particular assignee accepts is a matter of contract and depends on the terms of the agreement. *Corsiglia v. Summit Center Corp.*, 348 N.W.2d 647, 650 (Iowa 1984). The agreement here states that the assignee assumed performance of all the terms, covenants and conditions of the assignor. Thus, whatever damages may be calculated should not be reduced on the basis of the percentage of interest received.

As for the percentage of owners named as plaintiffs, the record is grossly undeveloped as to this issue. Carden raised the issue in a footnote at the end of a 31-page resistance brief. Doc. No. 35-6 at 30 n.12. Plaintiffs do not appear to have addressed the issue at all. No party has presented arguments or cited evidence concerning Carden's claim that only 91.77% of the TIC owners are named as plaintiffs. While Carden may very well have good arguments for reducing any damage award to account for the fact that some of the TIC owners are not parties, he has not advanced those arguments in his filings and is not entitled to summary judgment on this issue.

## V.    CONCLUSION

For the reasons set forth herein:

1.    Defendant's motion (Doc. No. 31) for summary judgment is **denied.**

2.    Plaintiffs' motion (Doc. No. 32) for summary judgment is **denied**.

3.    Plaintiffs' motion (Doc. No. 53) for ruling on pending motion for summary judgment is **denied as moot**.

4.    This case will proceed to trial as scheduled.


**IT IS SO ORDERED.**

**DATED** this 29th day of September, 2017.

_____
Leonard T. Strand, Chief Judge